IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| MARY SCOTT DOE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Case No. AW-09-755 |
| ) | |
| BARACK OBAMA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Before this Court is a Motion to Dismiss filed on behalf of Defendants, Barack Obama, in his official capacity as President of the United States; Charles E. Johnson[1], in his official capacity as Acting Secretary of the Department of Health and Human Services ("HHS"); and Raynard S. Kingston[2], in his official capacity as Acting Director of the National Institutes of Health ("NIH") (collectively referred to as the "Government"). (Doc. No. 10.) Plaintiffs Mary Scott Doe, a human embryo frozen in cyro-preservation within the United States on behalf of herself and those similarly situated; National Organization for Embryonic Law ("NOEL"), a non-profit organization pursuing the legal protection of human life;[3] and four married couples[4] who are putative adopters of human embryos bring this complaint seeking declaratory and injunctive relief against the Defendants.[5] The Plaintiffs claim that President Obama's Executive

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kathleen Sebelius, as the confirmed successor to HHS's former Acting Secretary, Charles E. Johnson, is automatically substituted as the proper party defendant in this action.
[2] Likewise, Dr. Francis S. Collins, as the confirmed successor to NIH's former Acting Secretary, Raynard S. Kingston, is automatically substituted as the proper party defendant in this action.
[3] The complaint states that NOEL's "primary mission is to protect, support, educate, and pursue the legal protection of human life from its beginning at conception until after death." (Compl. ¶ 5.)
[4] Namely the couples are Peter and Suzanne Murray, Courtney and Tim Atnip, Steven and Kate Johnson, and Cora and Gregory Vest.
[5] The complaint originally included Nightlight Christian Adoptions ("Nightlight"), "which is a licensed adoption agency . . . and operates a program known as the Snowflake Frozen Embryo Adoption program that offers families who had frozen embryos brought into being by in vitro fertilization the opportunity to place those embryos for adoption by qualified parents." According to Plaintiffs' Motion for Leave to File an Amended Complaint,

Order 13505 issued on March 9, 2009, which removes some of the prior limitations on federally funded human embryo stem cell research, violates the frozen embryos' constitutional rights to due process, equal protection, and freedom from involuntary servitude under the Fifth, Fourteenth, and Thirteenth Amendments. Plaintiffs further argue that the President's Executive Order violates the Dickey-Wicker Amendment. Defendants argue, and this Court agrees, that Plaintiffs lack standing to bring this claim. The Court agrees that Plaintiffs fail to meet the requirements of standing; therefore, the Court need not engage in a detailed analysis of the substantive claims. Accordingly, this Court will **GRANT** Defendants' Motion to Dismiss.

## FACTUAL BACKGROUND

This case involves highly controversial issues concerning the morality of federally funded stem cell research on human embryos. At the heart of this controversy is one method used by researchers to derive a stem cell line or source from human embryos through a process that necessitates the destruction of the human embryos. Although some believe that embryo stem cell research has the potential for developing cures to numerous diseases, others believe that the destruction of human embryos in the extraction process equates to killing human life, which the Government should not use tax dollars to support. In 1996, Congress passed the Dickey-Wicker Amendment, which is an appropriations bill that prohibits the HHS and NIH from using federal funds in either "(1) the creation of human embryos for research purposes," or (2) "for research in which human embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed on fetuses in utero . . . ." Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, Division F, Title V, § 509(a), 123 Stat. 524, 803 (2009).

---

Nightlight no longer wishes to remain a party in this litigation and the Court will grant that motion in a separate order.

Former President George W. Bush issued a statement on August 9, 2001, in which he permitted federal funding for research on stem cell lines from "embryos that have already been destroyed" and were derived by private or foreign researchers.  George W. Bush, Former President of the United States, Presidential Address: Address to the Nation on Stem Cell Research from Crawford, Texas, 37 Weekly Comp. Pres. Doc. 32, 1149-51 (August 9, 2001), *available at* http://www.gpoaccess.gov/index.html (follow "Presidential Materials" hyperlink; then follow "Weekly Compilation of Presidential Documents"; then follow "2001" hyperlink; then follow "August 13, 2001" hyperlink).  In his statement, Bush explained that his policy was an attempt to balance the potential benefits of stem cell research, such as improving the lives of those suffering from "juvenile diabetes . . . Alzheimer's . . . Parkinson's . . . and spinal cord injuries," and the moral and ethical concerns raised in opposition to stem cell research.  *Id.* at 1149.  To this end, Bush issued Executive Order 13435 on June 20, 2007, which reinforced his ban on federally funded research on stem cell lines created after August 9, 2001, and encouraged research into non-embryonic sources of stem cell research.

On March 9, 2009, President Obama issued Executive Order 13505 entitled, "Removing Barriers to Responsible Scientific Research Involving Human Stem Cells," which removed prior Presidential limitations on stem cell research and permitted the NIH to "support and conduct responsible . . . research, including human embryonic stem cell research, to the extent permitted by law." Exec. Order No. 13,505, 74 Fed. Reg. 10667 (March 9, 2009).  Specifically, Obama's Executive Order revoked Bush's Executive Order 13435 and explained that Bush's August 9 statement was no longer effective as a statement of governmental policy.  *Id.* at 10668.  On April 23, 2009, the NIH issued draft guidelines as directed by Obama's Executive Order, which explain that NIH has funded embryonic stem cell research on stem cells derived from human

embryos prior to the August 9 deadline that were created for reproductive purposes and were donated for research after they were no longer needed for reproduction.[6]  The proposed guidelines acknowledge that Obama's Order permits federal funding for research on stem cell lines created after August 9, 2001, but still limits funding to stem cell research on embryos that were created for reproduction purposes and donated for research after the donors no longer needed them for reproduction.  The guidelines also include assurances that the donor was not unduly influenced in making the decision to donate the embryos for research.

Plaintiffs' complaint requests that this Court invalidate Executive Order 13505 and enjoin its implementation because it allows for federal funding of stem cell research that destroys human embryos in violation of the Dickey-Wicker Amendment and violates the embryos' constitutional rights to due process and equal protection guaranteed under the Fifth and Fourteenth Amendments and to freedom from slavery and involuntary servitude guaranteed under the Thirteenth Amendment.

## STANDARD OF REVIEW

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, federal courts must dismiss claims where the court lacks subject-matter jurisdiction.  Although courts are permitted to consider materials outside of the pleadings to determine whether it can exercise subject-matter jurisdiction, the court must generally accept as true all factual allegations pled in the complaint. *Albright v. Oliver*, 510 U.S. 266, 268 (1994).  However, as explained in *Twombly*, "although for the purposes of a motion to dismiss [the court] must take all the factual allegations in the complaint as true, [the court] 'is not bound to accept as true legal conclusions couched as factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

---

[6] Since the filing of the briefs on this motion, NIH issued final guidelines relating to federally funded human embryo stem cell research.

Plaintiffs bringing claims in federal court must meet the requirements of standing in order for the court to exercise subject-matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 559, 560 (1992). (stating that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.")  The "[s]tanding doctrine functions to ensure . . . that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake" in the alleged claim. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000).  Further, when considering whether a party has standing to bring an action, the focus for the Court is on the party asserting the claim and "not on the issue the party wishes to have adjudicated."  *Flast v. Cohen*, 392 U.S. 83, 99 (1968). Plaintiffs bear the burden of establishing the three elements of Article III standing which are: (1) injury in fact; (2) causation; and (3) redressability. *Lujan*, 504 U.S. at 561-62.  An injury in fact is "an invasion of a *legally protected* interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (emphasis added).  Most notably, "the frustration of a party's generalized interest in the proper application of the law is not by itself an injury in fact for purposes of standing." *Delta Commercial Fisheries Ass'n v. Gulf of Me. Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004).  Moreover, to show the causation element, the plaintiff must show that the suffered injury is "fairly traceable to the defendant" and not the result of the independent acts of a third-party who is not a party in the case. *Friends of the Earth, Inc.*, 528 U.S. at 180-81.  Lastly, the plaintiff must demonstrate that there is a "substantial likelihood" that the alleged harm will be remedied if the Court grants the relief sought. *Id.* at 181.

In addition to establishing the constitutional requirements of standing, plaintiffs must also demonstrate that their claims can survive prudential limitations to the federal court's exercise of

jurisdiction. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). The Supreme Court has recognized three additional limitations to establishing standing, namely that (1) the plaintiffs' injury must be in the zone of interest the statue at issue is intended to protect; (2) plaintiffs cannot assert the claims of others unless they stand in close relationship to the third party; and (3) plaintiffs cannot air general grievances shared by a large class of persons. *See id.* "Without such limitations—closely related to [Article] III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin,* 422 U.S. 490, 500 (1975).

The Defendants argue that even if the Court were to find that Plaintiffs meet the requirements of standing, their claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Because this Court agrees with Defendants, and finds that all Plaintiffs lack standing, the Court dismisses the compliant without needing to address the merits of the substantive claims.

I. **Standing**

A. **Embryos**

The complaint names "Mary Doe," an unspecified embryo frozen in a state of "cyro-preservation" in some undetermined location within the United States as a Plaintiff in this action, and asserts that Mary Doe, along with nearly 20,000 other embryos, are "human beings" who will suffer an imminent threat of destruction or involuntary servitude if federal funding for stem cell research on human embryos is permitted. The so-called embryo Plaintiffs argue in their opposition that the standard for a motion to dismiss requires this Court to presume as true their "factual" allegation that embryos are "human beings." However, as the Defendants argue, the

Supreme Court's decision in *Ashcort v. Igbal*, makes clear that "the tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." 129 S. Ct. 1937, 1949 (2009).

The Supreme Court has already determined that the word "person [as used] in the Fourteenth Amendment does not include the unborn." *Roe v. Wade*, 410 U.S. 113 (1973). Plaintiffs argue that the Court's holding in *Roe* and the Eastern District's decision in *Roe v. Casey*, 464 F. Supp. 483 (E.D. Pa. 1978), "were greatly influenced by the competing interests and constitutional rights of the mother," which they contend is not an issue in this case because these embryos have not yet been implanted in a woman's womb thereby invoking the mother's rights. (Doc. No. 12 at 23-25.) Plaintiffs cite to several law review articles that argue that *Roe* and *Casey* are limited to abortion cases and thus should have no bearing on the status of embryos ex utero. However, the Court in *Roe* did consider that a pregnant woman's rights were not isolated and that at some point it would become reasonable for the State to consider another interest, namely that of "potential human life." *Roe*, 410 U.S. at 150. The Court went on to explain that it did not need to resolve the "difficult question of when life begins" because the lack of consensus in the medical field on that question suggested that the judiciary was not "in a position to speculate as to the answer." *Id.* at 158. Nevertheless, the Court looked to areas of the law outside of criminal abortion, and determined that "in short, the unborn have never been recognized in the law as whole persons." *Id.* at 162.

Moreover, in dismissing a claim asserted by an unspecified embryo seeking to enjoin the NIH from submitting a report to the HHS on human fetal tissue research, this Court in *Doe v. Shalala* declined to appoint a guardian ad litem to the embryos because "embryos are not persons with legally protectable interests . . ." 862 F. Supp. 1427 (D. Md. 1994), *vacated*, *Int'l Found.*

*For Genetic Research (Michael Fund) v. Shalala*, 57 F.3d 1066 (4th Cir. 1995) (vacating the district court judgment because the case became moot on appeal and instructing dismissal of the case on remand), *cert. denied*, 126 S. Ct. 116 (2005).  In fact, the District Court for the District of Columbia also found that embryos seeking to enjoin the NIH from implementing the finalized version of guidelines to Executive Order 13505, which were only in draft form when this motion was filed, lacked standing to pursue their claims because they "are not persons under the law." Sherely v. Sebelius, No. 1:09CV1575(RCL), 2009 WL 3429349, at *4 (D.D.C. Oct. 27, 2009). This Court agrees and accordingly holds that in order to establish an injury in fact, the embryos must be able show an "invasion of a legally protected interest," which embryos do not possess as they are not considered to be persons under the law.  Furthermore, the Court notes that even without Executive Order 13505, parents of the unused embryos could still donate the eggs to private institutions for research purposes and it is the independent decision of parties not currently before the Court that causes the alleged harm.  Thus, even assuming arguendo that embryos have a legally protected interest, this Court would still find they lack standing in this case because their injury is not "fairly traceable" to the Defendants' act of issuing and implementing Executive Order 13505.

    **B. NOEL**

The complaint alleges that NOEL is entitled to declaratory and other necessary relief because "its purpose is a constitutional legal challenge to establish the equal humanity of preborn children beginning as human embryos."  (Compl. ¶ 80.)  However, the Plaintiffs' opposition to the Motion to Dismiss fails to address how NOEL has standing to bring this claim.  In any event, organizations must establish standing by either bringing claims to assert the rights of the organization itself or to litigate claims on behalf of its members.  *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001).  To establish standing on behalf of its members,

the organization must show that (a) the members have suffered an injury and have standing to bring their claims on their own, (b) the interest sought to be protected is germane to the organization's purpose, and (c) "neither the claim made nor relief sought requires the participation of its members."  *White Tail Park, Inc. v. Strouble*, 413 F.3d 451, 458 (4th Cir. 2005).

The complaint does not allege any injury suffered by the members of NOEL, and thus NOEL appears to be bringing a claim to assert the organizations' rights.  To the extent that the complaint alleges that NOEL suffers an injury because it is unable to fulfill its purpose of bringing legal challenges in the hopes of establishing "equal humanity of preborn children," the Court does not find this injury sufficient to meet the requirements of standing.  First, as Defendants note, NOEL is fulfilling its purpose of pursuing constitutional challenges by the very act of filing this lawsuit.  Moreover, as pointed out by Defendants, this Court has already ruled that a mere "conflict between a defendant's conduct and [an] organization's mission is alone insufficient to establish Article III standing."  *Buchanan*, 125 F. Supp. 2d at 737-38 (quoting *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996)).  The court in *Buchanan* further stated that an "abstract social interest . . . was insufficient to support Article III standing."  *Id.*  Accordingly, the Court finds that NOEL's desire to obtain equal rights for the unborn by bringing constitutional challenges is no more than an "abstract social interest" which the Court is not permitted to entertain without a more concrete injury.

### C. Adoptive parents

The putative adoptive parents allege that they have children whom they adopted in vitro and are "considering the adoption of and/or seeking to adopt in vitro human embryos," and assert that Defendants' actions will "necessarily reduce the number of in vitro human embryos available for adoption." (Compl. ¶ 82.)  Although it is arguable from the complaint whether the

potential adoptive parents have concrete plans to adopt an embryo, for the purposes of a motion to dismiss, the Court must infer this allegation in favor of the Plaintiffs. However, the guidelines proposed by NIH to implement Executive Order 13505 restrict federal funding to embryos donated for research purposes after the donors of the unused embryos no longer need the embryos for reproduction. Moreover, the draft guidelines specifically require the donors to be informed of all their options concerning their unused embryos and seek to create precautions to ensure that donors are not influenced into choosing donation for research over other options such as storage for later use, adoption, or disposal. Thus, it is the donor's choice which could potentially reduce the number of human embryos for adoption and not the Defendants' conduct which "causes" Plaintiffs' alleged injury. Accordingly, the Court concludes that the adoptive parent Plaintiffs lack Article III standing to assert any claim alleged in the complaint.

Moreover, the Court notes that the adoptive parent Plaintiffs cannot overcome the prudential limitations to standing. First, given the hypothetical nature of these unspecified embryos the Court finds that the Plaintiffs do not stand in a sufficiently close relationship to the embryos to bring a claim on their behalf. In any event, the embryos must themselves have standing on their own for the adoptive parents to represent their claims, and as discussed above, embryos lack such standing. Moreover, the adoptive parents argue that "as federal taxpayers who are morally opposed to destructive stem cell research, [they] clearly fall within the zone of interest that the Dickey-Wicker Amendment seeks to protect," which they allege is "to keep federal taxpayers from being morally complicit in the killing of embryos for their stem cells." (Doc. No. 12 at 45.) However, as Defendants point out, this type of claim is exactly what the prudential limitations to standing were intended to foreclose. Otherwise, such claims would open the "floodgates" of the court and would permit any taxpayer with a moral or political

opposition to a governmental action to hash out those grievances in court.  The prudential limitations on standing exist, even when Article III standing can be established, because the "judiciary [should] seek to avoid deciding questions of broad social import where no individual rights would be vindicated . . . ."  *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979)).  Accordingly, this Court declines to exercise its jurisdiction to hear this case based solely on Plaintiffs' moral opposition to human embryo stem cell research.

## CONCLUSION

For the foregoing reasons, the Court holds that all of the presented Plaintiffs lack standing to assert the rights and claims alleged in the complaint.  Therefore, the Court GRANTS Defendants' Motion to Dismiss (Doc. No. 10).  A separate order shall follow this Memorandum Opinion.

<u>November 24, 2009</u>                                    /s/
Date                                    Alexander Williams, Jr.
                                    United States District Court Judge